MATTER OF BOAC PLANE "FLIGHT No. 523"

In FINE Proceedings

F-0400-821

*Decided by Board November 1, 1955*

**Fine—Section 271 of 1952 act—Not incurred despite absence of immigration inspection when alien was routed through Federal inspection area.**

Fine will not be imposed against an airline under section 271 of the 1952 act for failure to prevent the unauthorized landing of an alien passenger when the record establishes that the passenger was routed through the Federal inspection facility at the airport, received Public Health and Customs clearance, and could not have passed from Public Health to Customs without having proceeded through the Immigration inspection area.

### BEFORE THE BOARD

**Discussion:** This matter is before us on appeal from a decision of the District Director at Philadelphia dated May 6, 1955, ordering that fine in the sum of $1,000, mitigated to the extent of $500, be imposed on the British Overseas Airways, Inc., owners and/or agents of BOAC Plane Flight No. 523, which arrived at the port of Philadelphia, Pennsylvania, from foreign on October 3, 1954, for failure to prevent the landing of alien passenger W——A——W—— at a time and place other than as designated by the immigration officers.

The aircraft in question was diverted from New York, its original destination, to Philadelphia because of weather conditions. At the latter port, the nine members of the crew and 64 of the 65 passengers aboard were presented for inspection and were inspected. Subsequent to such inspection, and after the departure from the Philadelphia airport of the passengers inspected, a check of the passenger lists and the immigration documents revealed that the above-named alien had not, according to the records of the Service, been inspected, although he had been inspected and cleared by the United States Public Health Service and Customs. The subject alien was presented later the same day at the Idlewild Airport, New York, where he was inspected by a Service official and admitted as a visitor (B-2) for a period until October 30, 1954. According to the record, he departed from the United States in accordance with the terms of his admission.

1

Due notice of the diversion of the flight was given the Service. Immediately upon the plane's landing, all the crewmembers and passengers were escorted to the area of the airport administration building designated and set aside for Government inspection, Public Health, Immigration and Customs. The captain of the aircraft remained with the members of his crew and the passengers continuously during the inspection period in order to insure that all persons subject to inspection were in fact inspected. The record indicates that the subject alien received Public Health and Customs inspection and clearance. Also, according to the record, once the subject had received Public Health inspection and clearance he could not have received Customs inspection and clearance without having passed through the Immigration inspection area where three officers were on duty. In this connection, section 235(a) of the Immigration and Nationality Act imposes a duty on the Service to conduct the inspection of an alien applicant for admission presented for inspection, as this alien was, according to the record. The record is clear that the alien did not intentionally and deliberately evade inspection. In this connection, counsel asserts that the passenger was probably overlooked because of his short stature and the height of the counter in the inspection area from behind which the officers apparently conducted their inspection.

The carrier chartered buses to carry the passengers from Philadelphia to New York, the flight's scheduled termination point. Following inspection by the three Government services mentioned above, the captain assigned a member of his crew to board each bus to escort the passengers to New York. In order to assure that all Government requirements concerning Immigration and Customs inspection has been complied with fully, the captain personally inquired of the Immigration and Customs officials then on duty and in charge whether all passengers and crewmembers had been duly inspected and cleared for entry into the United States. These officials answered the captain's question in the affirmative and on the basis of such assurances, and not until their receipt, the captain permitted the chartered buses to leave the Philadelphia airport for the trip to New York. The subject alien was among the passengers who boarded one of the buses at Philadelphia, and he continued to New York on the bus in the custody of the carrier's stewardess. In other words, the carrier did not permit the subject to leave the Philadelphia airport until the Service had assured it that his inspection had been made. As we see it, such assurance should have been given by the Service only after the manifest and immigration documents had been checked off against one another. However, according to the record, such a check was not made until after the buses had departed from the Philadelphia airport.

2

When the fact that the subject alien had not been inspected was discovered, the matter was brought to the attention of the carrier. Through its excellent cooperation, the subject alien's inspection was completed immediately upon his arrival at New York. At all times until said inspection was completed and the alien admitted to the United States, he was in the custody of the carrier.

The foregoing facts are established by the affidavits of the alien passenger involved and five of the carrier's employees, together with a floor plan of the airport facilities set aside for the Government inspection by the Public Health, Immigration and Customs services. None of the facts stated above are denied or controverted in the decision of the district director, except that said official has apparently discounted the carrier's contention that it was impossible for the passenger to enter the Customs inspection area without passing through the Immigration inspection area.

On the basis of the foregoing, we find that a violation of section 271 of the Immigration and Nationality Act has not been established in these premises. The reasons are that the alien entered the inspection area; the Service first reported to the carrier's representative that *all* passengers had been inspected; and the carrier has met the burden of showing compliance with the statute. Therefore, we conclude that the appeal must be sustained and no fine imposed. We will now so order.

**Order:** It is ordered that the appeal be and the same is hereby sustained and that fine be not imposed.

3